UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

LATASHA R. LANG,

                Plaintiff,           Case No.: 11-cv-13248
                                    Honorable Denise Page Hood
        v.                    Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [20, 25]**

    Plaintiff Latasha Lang brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.    RECOMMENDATION**

    For the reasons set forth below, the court finds that the ALJ's conclusion that Lang was not disabled is supported by substantial evidence in the record. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [25] be GRANTED, Lang's motion [20] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

## II.     REPORT

### A.     Procedural History

On January 5, 2005, Lang filed applications for DIB and SSI, alleging disability as of August 11, 2003.  (Tr. 54-56).  The claims were denied on May 20, 2005, and no appeal was taken. (Tr. 36-40).  On November 10, 2005, Lang filed a new application for SSI, again alleging disability as of August 11, 2003.  (Tr. 395-97).  On November 28, 2005, she filed a new application for DIB, again alleging the same onset date.  (Tr. 57-59).  Both claims were denied on March 1, 2006.  (Tr. 41-44; 399-402).   Thereafter, Lang filed a timely request for an administrative hearing, which was held on August 6, 2007, before ALJ Jerome Blum.  (Tr. 403-443).  Lang, unrepresented, testified, as did Vocational Expert ("VE") Elizabeth Pasikowski. (*Id.*).  On October 17, 2007, the ALJ found Lang not disabled as she was able to return to her past work.  (Tr. 11-19).  On March 27, 2008, the Appeals Council denied review.  (Tr. 6-8).

Lang filed a complaint in this court for judicial review of the final decision and, pursuant to a stipulation between the parties, the court remanded the matter back to the Commissioner for further proceedings.  (Tr. 493-94; 496; 498-99).  The matter first went to the Appeals Council, which vacated the prior ALJ decision based on the ALJ's failure to: (1) give good reasons for discounting a treating physician's opinion, (2) explain his RFC assessment with regard to exertional and nonexertional limitations, and (3) consult a VE regarding the nature and requirements of Lang's past work.  (Tr. 510-12).   The Appeals Council then remanded the case back to the ALJ for a new hearing, consideration of additional medical records and further proceedings consistent with its opinion.  (*Id.*).

A new hearing was held before ALJ Blum on January 5, 2010. (Tr. 761-801).  Lang, represented by counsel, testified, as did a VE.  (*Id.*).  On September 10, 2010, the ALJ again

2

found Lang not disabled because there were a significant number of jobs in the national economy that she could still perform. (Tr. 453-66). On May 31, 2011, the Appeals Council denied review. (Tr. 444-46). On July 26, 2011, Lang filed the present action [1].

**B.     Background**

*1.     Disability Reports*

*a.     January 25, 2005 Function Report*

In a January 25, 2005 function report, Lang reported that she generally lives alone, but sometimes lives with her mother due to her sickness. (Tr. 96). Her day consists of waking up and vomiting, feeling sick and hot during the day, being unable to sleep due to pain her stomach. (*Id.*). She reported vomiting at least once a day. (*Id.*). She reported that the things she was able to do before her illness that she is no longer able to do include functioning, keeping focus and being active. (Tr. 97). She reported that her conditions affect her sleep because she has stomach pain that prevents her from sleeping and she sometimes wakes in order to vomit. (*Id.*). She also has difficulty using the toilet due to pain. (*Id.*).

Lang reported that her mother cooks her meals and had to remind her occasionally to take her medication. (Tr. 98). Lang is able to iron and do the laundry, although the latter she only does every three months. (*Id.*). She also reported that she requires guidance and help to do these things. (*Id.*). She reported taking her daughter to school every other day and going to the doctor, and that she is able to drive and ride in a car, but cannot go alone. (Tr. 99). She shops approximately twice a month, and is able to handle her own finances. (Tr. 99-100). Lang reported that she used to enjoy basketball, doing hair and watching television regularly, but that although she still attempts (albeit infrequently) to engage in those activities, she now has a hard time focusing on television or books and she cannot play basketball like she used to. (Tr. 100).

3

She visits her mother, goes to church, or goes next door to her best friend's house. (*Id.*).

Lang reported that her conditions affect her ability to lift, stand, reach, concentrate, follow instructions, use her hands, and get along with others. (Tr. 101). She has trouble lifting and standing due to pain. (*Id.*). She can walk 45 minutes before needing to rest 10 minutes due to dizziness and pain. (*Id.*). She can pay attention "for a few minutes" before her mind dr[i]fts off." (*Id.*). She is able to follow instructions and gets along with authority figures "pretty well." (Tr. 101-102). She does not respond well to stress or changes in her routine. (Tr. 102).

b.    *December 28, 200, Function Report*

In a December 28, 2005 function report, Lang reported that her illness determines her day, and therefore her activities depend on whether she has stomach pains and is throwing up or not. (Tr. 109). She reported taking her daughter to school and trying to help with homework, essentially "everything a parent must do I try to get it done." (Tr. 110). Her mother helps her with her daughter. (*Id.*). Lang reported sometimes being up two days in a row without sleep due to pain and nausea. (*Id.*). She reported that her hair has fallen out due to stress and she has no desire to get dressed anymore. (*Id.*). She also reported having Irritable Bowel Syndrome ("IBS"). (*Id.*).

Lang reported that it takes her hours to clean the house and that standing can cause pain. (Tr. 111). She prepares light meals like sandwiches and frozen dinners weekly. (*Id.*). She only goes out to take her daughter to school, go to the doctor and shop twice a month. (Tr. 112). She reported being able to drive and go out by herself. (*Id.*).

Lang reported that her conditions affect her ability to lift, see, concentrate, understand and get along with others, as well as her memory. (Tr. 114). She does not finish what she starts. (*Id.*). She can walk two miles before needing to rest for 15 minutes. (*Id.*). She has a hard time

4

following written instructions but can follow spoken instructions "well." (*Id.*).

### c.     June 19, 2007 Disability Report

In a June 19, 2007 disability report, Lang reported that the conditions preventing her from working include ovarian syndrome, endometriosis, hypertension, IBS and pancreatitis. (Tr. 117). These conditions prevent her from working because she has pain in her stomach that shoots down her legs, and she suffers from constant nausea, vomiting and severe and frequent headaches. (Tr. 118). She reported seeing several doctors for her conditions and being on a number of medications, including six for her blood pressure alone. (Tr. 120-23).

### d.     Undated Disability Appeals Report

In an undated disability appeals report, Lang reported that her condition had worsened since her last report. Now her blood pressure would not go down, she had an enlarged liver due to pancreatitis, and she is "always sick." (Tr. 126). She continues to be on five medications for blood pressure, as well as medications for pain, endometriosis, IBS, and depression. (Tr. 129). She reported being very tired with no energy, having headaches, chest and stomach pains, constant vomiting and pain on her left side. (Tr. 130). She also reported blurred vision. (*Id.*).

### e.     Undated Disability Report

In an undated disability report, Lang reported that the conditions affecting her ability to work include ovarian syndrome, endometriosis, hypertension, IBS and depression. (Tr. 524). She reported that these conditions prevented her from working because she has shooting pain down her legs, is nauseated and vomits, and has frequent headaches. (*Id.*). She also reported that she does not like to go out because of her depression. (*Id.*). She reported taking four blood pressure medications and Topamax for migraines. (Tr. 528).

*f.        January 29, 2008 Function Report*

In a January 29, 2008 function report, Lang reported that her day is spent getting her daughter ready for school (if she is not sick), taking her medication, taking a nap, watching television or sitting and crying, possibly cooking, making doctor appointments, and feeling sick until her medication begins to work.  (Tr. 535).  She reported that she cannot sleep at night because of shooting pains in her stomach.  (Tr. 536).  She reported her mother reminds her to take her medications.  (Tr. 537).  Lang reported being able to cook her own meals, do laundry and clean although she sometimes needs help with these tasks.  (*Id.*).  She reported that while she can ride in a car and will shop twice a month, she generally does not go out because she does not feel like it.  (Tr. 538).  She does not drive.  (*Id.*).  Lang reported that her conditions affect her ability to talk, see, concentrate, remember and use her hands.  (Tr. 540).  She reported that sometimes her words do not "come out right" when she talks, that she cannot concentrate, that her vision occasionally "goes out," and that her hands go to sleep.  (*Id.*).  She reported being able to walk about one mile and pay attention for one minute.  (*Id.*).  She reported not following instructions well, but that she did get along well with authority figures.  (Tr. 540-41).  She does not handle stress or changes in her routine well.  (Tr. 541).

2.        *August 6, 2007 Hearing*

a.        *Plaintiff's Testimony*

At the August 6, 2007 hearing, Lang testified that she completed high school and two years of college before she got sick and had to stop.  (Tr. 405-406).  She did not get a degree.  (*Id.*).  She worked at the Pontiac Police Department as a police cadet until she went on medical leave and then was not allowed back to work because her blood pressure was too high.  (Tr. 407; 439).  She lives with her eleven-year-old daughter.  (Tr. 408-409).  Lang testified she does not

drive, but has family members drive her where she needs to go, including to doctor appointments and grocery shopping. (Tr. 409-10). She suffers from pancreatitis, endometriosis, high blood pressure, migraine headaches and IBS. (Tr. 406-407). She testified to waking up sick every morning, being dizzy and nauseated, getting bad headaches and being depressed by her condition. (Tr. 411-12). She takes numerous medications for her conditions, including four different blood pressure medications but, despite that, her last blood pressure reading was 200/115. (Tr. 413-17). Her average blood pressure reading is about 180/100. (Tr. 417). Lang testified to being in the emergency room several times for the effects of her high blood pressure, as well as being hospitalized for pancreatitis. (Tr. 421-25). She suffers from chest pains and recently had an EKG for her heart, but her doctor would not conduct a stress test because her blood pressure was too high. (Tr. 430-31).

### b.    VE Testimony

VE Elizabeth Pasikowski testified that Lang's previous work as a police cadet was semi-skilled medium, and her work as an office clerk was unskilled sedentary. (Tr. 434). The ALJ asked the VE if a person was physically capable of sitting eight hours a day and lifting up to ten pounds, could that person return to officer clerk work. (Tr. 435). The VE testified that she could. (*Id.*).

### 3.    January 5, 2010 Hearing

### a.    Plaintiff's Testimony

At the post-remand hearing held on January 5, 2010, Lang testified that she had originally worked for the Pontiac Police Department as a police cadet, but was moved to an account clerk job due to her high blood pressure in May 2003. (Tr. 765-66). She had gotten sick one day at work and went to the hospital where she was determined to have a pancreas condition and high

7

blood pressure. (*Id.*). Additional tests were run which determined she also had endometriosis. (Tr. 766). She got dizzy again at work and went back to see a doctor to check her blood pressure. (Tr. 767). After that check, the police department would not take her back until her health condition was under control. (*Id.*). Lang testified that since that time she has never gotten her blood pressure under control. (*Id.*). She was referred to a cardiologist because her blood pressure was not responding to treatment and she was being sent to the hospital for dizziness and vomiting. (Tr. 768). She has since been taking a number of blood pressure medications, but those medications have not been effective. (Tr. 768-69). Lang testified that her blood pressure fluctuates for a number of reasons, including physical and emotional stress. (Tr. 769-71). When it occurs she gets migraine headaches, nauseated and dizzy. (Tr. 770). This occurs approximately twice a month. (*Id.*). Her doctor has informed her she needs to be in a calm, relaxed area. (*Id.*). She is able to lower her blood pressure by lying on her left side, which she does approximately once a day for 45 minutes. (Tr. 771). She testified that she needs to pace herself in her activities in order to prevent her pressure from rising. (*Id.*).

Lang testified that her blood pressure is elevated approximately two to three days out of the week on an unpredictable basis, and when it is she needs to sit or lie down and rest for an hour to "hours," in a quiet space. (Tr. 776-77). She has two children, a thirteen-year-old and a seven-month-old. (Tr. 781-82). She testified that her family, including her thirteen-year-old, helps with the baby so she can rest, and also help with the cleaning and shopping. (Tr. 784-85).

Lang testified that none of her previous jobs were sedentary in nature, but that she did not believe she could even perform a job that allowed her to sit for six hours out of an eight hour day for several reasons, including the side effects of her medications, which make her drowsy, and the fact that she gets anxious from sitting so long, which is why she no longer watches television.

8

(Tr. 772-73; 777-78). She testified that she believes she is depressed, but is not currently being treated for depression because she has no medical coverage and has no mode of transportation; as her main priority at this time is getting to her cardiologist on a regular basis. (Tr. 773-75).

Lang testified that, in addition to her blood pressure she also suffers from anxiety and an inability to sleep, as well as problems with her left arm following a surgery six months prior for thrombophlebitis which developed from an infection at an IV site during delivery of her son. (Tr. 781; 787-91). She testified that she cannot lift her baby with that arm, and is precluded from lifting more than 5-10 pounds with it. (Tr. 787).

### b.    VE Testimony

VE Christian Barrett testified that Lang's previous work as a police cadet was classified as light and semi-skilled and her work as an office clerk, as performed, was light and semi-skilled. (Tr. 794-96). The ALJ then asked the VE if there were transferrable skills to purely sedentary jobs. (Tr. 796). The VE testified that there were and that those jobs included: invoice clerk, appointment clerk, accounts receivable clerk, accounts payable clerk and data entry clerk. (Tr. 796-97). The VE testified that the number of those jobs in the metropolitan area is about 12,000; 20,000 in the state and 300,000 in the nation. (Tr. 797). The ALJ then asked the VE if all of Lang's testimony were accepted, would she be precluded from gainful activity. (*Id.*). The VE testified that she would because of the side effects of her medication, her pain and her need to lie down periodically. (Tr. 798). Lang's counsel then asked if the side effects of her medication alone would preclude her ability to perform gainful activity. (*Id.*). The VE testified that it would. (*Id.*). Counsel then asked if her need to lie down for 45 minutes a day would preclude such activity as well. (*Id.*). The VE testified that it would. (*Id.*). Counsel also asked if Lang's need to miss work two days a week would preclude her from sustained gainful activity.

(Tr. 799).  The VE testified that it would.  (*Id.*).  Last, counsel asked if the VE's assumptions, in addition to the hypothetical the ALJ proposed, included an individual's ability to sit six hours out of an eight-hour day, work forty hours a week and lift under ten pounds.  (*Id.*).  The VE testified that it did.  (*Id.*).

### 4.    Medical Evidence

Although Lang suffers from, and the ALJ acknowledged as severe, numerous conditions, because on appeal Lang only takes issue with the ALJ's analysis regarding her uncontrolled hypertension and mental limitations, the court will limit its discussion of the medical evidence to those two conditions.

### a.    Blood Pressure

#### i.    Treating Sources

##### A.    Emergency Room Records

On May 15, 2003, Lang was admitted to the hospital for acute pancreatitis.  At the time her blood pressure was 139/83.  (Tr. 212).  Lang was admitted to the hospital again on July 8, 2003, with acute pancreatitis and new onset hypertension.  At the time her blood pressure was 126/84.  (Tr. 230).  Over the course of treatment, her blood pressure was 154/94, 180/36 and 150/98.  (Tr. 231).  The doctor prescribed sublingual Clonidine and Norvasc, and Lang's blood pressure normalized.  (*Id.*).  On October 28, 2003, Lang was treated in the emergency room for abdominal pain, hypertension and anxiety.  (Tr. 273).  Her blood pressure was 168/91.  (Tr. 274). The doctors continued her Norvasc.  (*Id.*).  An electrocardiogram ("ECG") was normal.  (Tr. 279).  Lang was treated again in the emergency room on January 10, 2004, for abdominal pain. (Tr. 303).  At the time she did not report being on Norvasc.  (*Id.*).  Her blood pressure was 167/90.  (*Id.*).  She was not prescribed any blood pressure medication.  (Tr. 304-305).  On March

10

18, 2004, Lang again was treated in the emergency room for abdominal pain. (Tr. 311). Her blood pressure was 139/85. (*Id.*). There was no indication in the record whether she was taking blood pressure medication or not. (Tr. 309-13). On January 13, 2005, Lang was treated in the emergency room for abdominal pain and vomiting. (Tr. 342-44). Her blood pressure was 161/110. (*Id.*). There was no discussion of hypertension at the time. (Tr. 342-46). On February 8, 2005, Lang was treated in the emergency room for abdominal pain, and her blood pressure was 165/101, and 135/91, respectively, although there was no discussion of hypertension or medication for hypertension at this visit. (Tr. 320-22; 327-28). On November 13, 2005, Lang was again treated in the emergency room for abdominal pain. (Tr. 372-76). Her blood pressure was 164/103. (Tr. 374). She reported not having taken her blood pressure medication that day. (Tr. 374). On December 29, 2005, Lang was treated in the emergency room for acute stomach pain, nausea, vomiting and diarrhea. (Tr. 250-52). Her blood pressure was 150/92. (*Id.*).

### A.      *Dr. Simon Pullukat*

2003 treating records from Dr. Simon Pullukat, Lang's primary care physician at the time, showed a normal blood pressure reading of 114/80[1] in January 2003, readings of 130/92, 130/88 and 110/60 in June 2003, a reading of 140/86 in August 2003, where it appears Dr. Pullukat prescribed Norvasc, and a reading of 160/96 in October 2003. (Tr. 352; 356; 358). At the October appointment, Dr. Pullukat noted that Lang was not taking the blood pressure medication he prescribed. (Tr. 356).

### B.      *Oakland Primary Health Services*

Records from Lang's current primary care physicians show that she often complained of

---

[1] Normal blood pressure is defined as 120/80 or below. Prehypertension is defined as 120-139/80-89. Hypertension stage one is defined as 140-159/90-99 and stage two is defined as 160 or higher/ 100 or higher. See National Heart Lung and Blood Institute: National Institutes of Health *at http://www.nhlbi.nih.gov/health/health-topics/topics/hbp/* (Last visited July 30, 2012).

high blood pressure at her appointments, and her blood pressure was consistently elevated at these appointments. (Tr. 614-47). At an appointment on September 22, 2006, Lang was diagnosed with migraines. (Tr. 638). At a November 9, 2006 appointment, Lang complained again of migraines and chest pain that had increased in frequency. (Tr. 629). She complained of headaches again on January 18, 2007, and of headaches and chest pain on April 25, 2007. (Tr. 621; 623). At her January 19, 2007 appointment, the doctor noted that Lang had been put on Tenormin for her headaches but that it had not been effective and he recommended Imitrex. (Tr. 621). Lang complained of blurry vision on July 24, 2007. (Tr. 392). She again complained of chest pain on January 24, 2008. (Tr. 615). At an undated visit between 2008 and 2009, Lang complained of headaches and blurred vision, however it was noted she had not taken her medication that day. (Tr. 677). She was given Norvasc in the office and her blood pressure lowered. (*Id.*). The record reflects that her primary care physicians generally appear to have deferred to her cardiologist regarding her blood pressure treatment and care, although on November 22, 2006, Dr. J. Saunders recommended that Lang engage in aerobic activity for 30 minutes per day, three days a week. (*See generally* Tr. 614-47; Tr. 626; 673-87). At a February 1, 2007 appointment, Dr. Saunders ordered a magnetic resonance angiograph ("MRA") for Lang's renal arteries, although results of that test are not in the file. (Tr. 622).

### B.      Dr. Thomas Mathew

Treatment records from Lang's cardiologist, Dr. Thomas Mathew, spanning from May 2004 through November 2007 consistently show elevated blood pressure readings, and that Dr. Mathew often changed Lang's medication in an effort to better control her blood pressure. (Tr. 569-89). The records also show that Lang occasionally complained of headaches and nausea but most often appeared at her appointments with "no complaints." (*See* Tr. 569-89; 695-702). She

also complained of chest pain at appointments on January 31, 2008, August 5, 2008, September 8, 2008, and April 13, 2009.  (Tr. 697; 700-702).

An ECG conducted on June 8, 2006, showed a possible left atrial enlargement and an "age undetermined" septal infarct.  (Tr. 590).  An August 2, 2007 ECG report was "abnormal," showing an "age undetermined" septal infarct,[2] and two pages of treatment notes.  (Tr. 388-92).  Lang underwent an ECG performed by Dr. Mathew on August 21, 2007.  (Tr. 569).  It revealed a thickened left ventricular wall, and mild mitral regurgitation, but was otherwise normal with an ejection fraction of 65%.  (Id.).  A stress test was also found to be normal.  (Id.).  An exercise test conducted found "[e]xercise inducible moderately severe hypertension."  (Tr. 570).  An ECG conducted on September 9, 2008, was abnormal, finding a sinus rhythm with "sinus arrhythmia" and an "age undetermined" septal infarct.  (Tr. 707).  Another ECG performed on June 20, 2009, however, was normal.  (Tr. 706).

On October 26, 2006, Dr. Mathew completed a medical needs statement for Lang, diagnosing her with hypertension which would require lifetime treatment.  (Tr. 384).  He stated that she was not non-ambulatory, did not need special transportation and did not need anyone to accompany her to examinations.  (Id.).  She further did not have any trouble with personal care, which included meal preparation, dressing, shopping, laundry and housework.  (Id.).  He concluded that she could not work at either of her previous occupations, and could not work at any occupation for a "lifetime."  (Id.).

Dr. Mathew completed another medical need statement for Lang on August 2, 2007.  (Tr. 385).  He diagnosed her with severe hypertension that would require lifetime treatment.  (Id.).

---

[2] A reading of that ECG noted "tiny R waves in leads V1 and V2, compatible with the old antroseptal myocardial infarction."  (Tr. 570).  The reading went on to state that "significance of this finding has to be clinically correlated."  (Id.).

Again, he found she was ambulatory, did not need special transportation and did not require anyone to accompany her to appointments. (*Id.*). She also had no problems with personal care. (*Id.*). He concluded that she could not return to her previous job, or work at any job "until [her] blood pressure is under control." (*Id.*). In a medical examination report completed the same day, Dr. Mathew noted that Lang's blood pressure was 150/90, and her examination areas were normal except for her cardiovascular examination, although he did not detail specific abnormalities. (Tr. 386). He found her status deteriorating and that she was limited to no lifting (even less than 10 pounds), and sitting about or less than six hours in an eight hour day. (Tr. 387). He placed no restrictions on her ability to stand or walk. (*Id.*). She could use both hands for grasping, reaching, pushing, pulling and fine manipulation, and could also push and pull with both feet. (*Id.*). He noted no mental limitations. (*Id.*). He found she could meet her needs in her home. (*Id.*).

A nurse in Dr. Mathew's office wrote a "To Whom it May Concern" letter for Lang on August 8, 2007, noting that she had been a patient of hers since May 2004 and that she was diagnosed with hypertension. (Tr. 394-95). The nurse further noted that over the course of seven months under her care (between January and July 2007, Lang's blood pressure varied from 150/90 to 220/140 and, on the date of the letter, it was 200/100. (*Id.*).

Dr. Mathew completed another medical needs statement for Lang on April 28, 2008, again diagnosing her with hypertension. (Tr. 662). He again found her ambulatory, in no need of special transportation or accompaniment to appointments, and capable of caring for her personal needs including housework, meal preparation and shopping. (*Id.*). He concluded that she could neither work at her previous job or any job until her blood pressure was under control. (*Id.*). Dr. Mathew completed additional medical needs statements for Lang on August 5, 2008,

and February 6, 2009, which were substantively identical to his previous medical needs statements. (Tr. 708; 710).

On March 1, 2010, Dr. Mathew was deposed. (Tr. 711-50). He stated that Lang's blood pressure was uncontrollable despite the numerous medications she had tried and that her complaints of headaches, dizziness, inability to concentrate and nausea were all symptoms of her uncontrolled hypertension. (Tr. 720). He stated that she was unable to work because her condition was unpredictable and there was no way of detecting when she would have an episode of a spike in blood pressure. (Tr. 722; 735). Things that could cause her blood pressure to spike include physical and mental stress, such as the simple long term commitment of sitting for a number of hours at a time. (Tr. 722; 736).

Dr. Mathew also stated that while there was no evidence of certain complications such as stroke or arterial diseases, Lang was already suffering from precursors to those complications based on her ECG readings which showed an enlarged heart, an infarct and a thickening of the myocardia. (Tr. 728-29). Furthermore, he concluded that the fact that she did not have these complications did not mean she was not suffering the symptoms of high blood pressure that prevented her from engaging in work, including dizziness and vomiting. (Tr. 744). In addition, he noted that she was only 29 years-old and that she was on the road to having these other complications in the future. (*Id.*). He noted that it was not prudent to wait until she had a stroke to take action to keep her blood pressure under control, and he was concerned that if he released her to work she might suffer a stroke, which was not medically responsible. (Tr. 729).

Dr. Mathew concluded that Lang could likely sit for two hours a day, but would need the freedom to change positions and lie down whenever she needed. (Tr. 738-39). She would also be able to stand for at most a half an hour a day. (Tr. 739). She could only perform work tasks if

15

allowed to do so at her own pace. (Tr. 740). He found her incapable of reaching with her arms, because that would increase her blood pressure, and she could not climb stairs or ramps, ladders or scaffolds, nor could she balance, stoop, bend, kneel, crouch or crawl. (Tr. 740-42). He found that she could engage in personal care activities as long as she was able to do so at her own pace. (Tr. 744-45).

### ii. *Consultative and Non-Examining Sources*

#### A. *April 23, 2005 Physical Consultative Examination*

Lang underwent a consultative examination on April 23, 2005, with Dr. Homan Mostafavi. (Tr. 367-69). Lang reported a history of uncontrolled hypertension (of upwards of 200) despite medication, which causes her to see floaters, be nauseous and have headaches. (Tr. 367). She reported that she is able go about her daily activities, although it takes her longer to do so, and she has no difficulty sitting, can stand for a couple of hours and has no difficulty walking. She reported being able to lift no more than 20 pounds. (*Id.*). Upon examination, Lang's blood pressure was 160/110, and her heart did not appear to be enlarged clinically. (Tr. 368). Dr. Mostafavi concluded that Lang had a history of severe hypertension, which was elevated upon examination and recommended that Lang "follow-up with her primary care and control this." (*Id.*).

#### B. *May 10, 2005 Physical Residual Functional Capacity Assessment*

On May 10, 2005, Medical Examiner Heidi Schonle completed a physical residual functional capacity ("RFC") assessment. (Tr. 168-75). She concluded that Lang was capable of lifting 50 pounds occasionally and 25 frequently, able to stand and/or walk six hours in an eight-hour work day, sit for the same amount of time, and had unlimited ability to push and pull. (Tr. 169). She had no postural limitations except that she was never to climb ladders, ropes or

16

scaffolds.  (Tr. 170).  She further had no manipulative, visual, communicative, or environmental limitations, except that she was precluded from working around hazards.  (Tr. 171-72).

C.     *April 29, 2008 Physical RFC Assessment*

Medical consultant Mary Lewis completed a physical RFC assessment for Lang on April 29, 2008.  (Tr. 561-68).  She found Lang capable of lifting 20 pounds occasionally and 10 pounds frequently, standing and/or walking six hours of an eight-hour day, and sitting for the same amount of time, with an unlimited ability to push and pull.  (Tr. 562).  She further found Lang capable of occasionally climbing ramps and stairs, stooping, kneeling, crouching and crawling, frequently capable of balancing, but never capable of climbing ladders or scaffolds. (Tr. 563).  Finally, she found that Lang should avoid all exposure to hazards.  (Tr. 565).  She concluded that Lang's "symptoms and allegations are not inconsistent with the medical evidence."  (Tr. 566).

D.     *July 6, 2009 Medical Expert Interrogatory and RFC*

A medical expert interrogatory was completed by Dr. Carl G. Leigh on July 6, 2009.  (Tr. 650-61).  Based on his review of the records, he concluded that Lang suffered from uncontrolled hypertension, as well as other conditions which were generally under control.  (Tr. 650; 652). Regarding Lang's hypertension, Dr. Leigh noted that despite its uncontrolled nature, there was no evidence of a cerebral vascular accident ("CVA" or stroke), a transient ischemic attack ("TIA" or mini stroke), or renal, cardiovascular or peripheral artery disease.  (Tr. 651).  He noted that an October 2003 ECG was normal and another in August 2007 showed a septal infarct, but age was undetermined.  (*Id.*).  He concluded that this abnormality may be simply a positional change or artifact, as Dr. Mathew did not mention any coronary artery disease and there was no development of such in the file.  (*Id.*).  He did not mention a June 2006 ECG which noted a

17

possible left atrial enlargement.  (Tr. 590).

Dr. Leigh concluded that Lang was capable of lifting and carrying up to ten pounds frequently, sitting six hours at one time and six hours a day, and standing and/or walking three hours at a time up to six hours a day.  (Tr. 653-54). He found no limitations in the use of her hands or feet, and he determined that she could occasionally climb stairs and ramps, frequently balance, stoop, kneel, crouch, and crawl, but that she could never climb ladders or scaffolds.  (Tr. 655-57).  He determined that she had no hearing or vision restrictions, but that she should not be exposed to unprotected heights and could not operate a commercial vehicle.  (Tr. 657-58).  He found that she could take care of her own personal needs including shopping and preparing meals.  (Tr. 659).  In a follow-up note, Dr. Leigh also recommended that Lang have ready access to a restroom for her IBS.  (Tr. 661).

> b.    *Mental Issues*

> i.    *Treating Sources*

During a hospital stay in October 2003, Lang was diagnosed with anxiety, among other physical conditions, due primarily, it appears, to her demeanor in the hospital during the time. (Tr. 273-74).   A psychiatric consult was requested and provided by Dr. Jamil, but it was determined she did not qualify for inpatient treatment and would follow up on an outpatient basis, but there is no evidence of any follow-up in the record.  (Tr. 274).  She was not prescribed any medication for her anxiety.  (Tr. 275).  Although not part of her complaints, Lang's primary care physician diagnosed her with depression at an appointment on October 23, 2007.  (Tr. 619). Her doctor prescribed Cymbalta.  (*Id.*).   Lang was again diagnosed with depression by her primary care physician on March 17, 2008.  (Tr. 614).  She was switched from Cymbalta to Lexapro.  (*Id.*).  In his deposition, Lang's cardiologist, Dr. Mathew, testified that one of the

18

reasons she could not work is that her blood pressure condition caused her to not be able to "think properly." (Tr. 718).

ii.        *Consultative and Non-Examining Sources*

A.        *March 15, 2005 Consultative Examination*

Lang underwent a consultative mental examination on March 15, 2003, with psychologist Dr. Margaret Zerba. (Tr. 364-66). Lang reported her physical ailments, and stated that she is also forgetful and that her mom has to remind her of appointments. (Tr. 364). She also reported that she sometimes cannot comprehend what people tell her. (*Id.*). She reported no friends and no hobbies, and that her mother sometimes lives with her and helps with the household chores. (*Id.*). Dr. Zerba noted that Lang drove herself to the appointment and frequently left to vomit in the restroom. (*Id.*). Her grooming and hygiene were noted to be poor. (*Id.*). Upon examination, Dr. Zerba found that Lang presented with "intact reality testing" but "impaired insight and fair-poor judgment." (Tr. 365). She had no evidence of psychosis, or suicidal or homicidal thoughts or plans. (*Id.*). She was sad, scared and depressed and cried throughout the exam. (*Id.*). She could repeat seven numbers forward and three backward, remember one of three objects, name three past presidents, two large cities out of five (naming three states instead of cities for the remainder), a number of famous people, could complete serial three counting and got two out of three simple multiplication questions correct. (Tr. 365). She could not interpret either of two proverbs, but could compare and contrast an apple and an orange, and a tree and a bush. (*Id.*). She was diagnosed with an anxiety disorder due to uncontrolled blood pressure and stomach condition, with generalized anxiety. (Tr. 366). Dr. Zerba issued Lang a Global Assessment of Functioning ("GAF") score of 40 and a guarded prognosis. (*Id.*).

B.      *May 12, 2005 Psychiatric Review Techniques and*
        *Mental RFC Assessment*

A May 12, 2005 psychiatric review technique was completed by psychologist Dr. Linda Brundage, covering the time period from March 15, 2005, onward.  (Tr. 136).  Dr. Brundage concluded that Lang suffered from an anxiety-related disorder that was due to her uncontrolled blood pressure and stomach conditions.  (Tr. 136; 141).  She concluded that Lang had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence and pace ("CPP").  (Tr. 146).  She had no episodes of decompensation.  (*Id.*).

In the Mental RFC form, Dr. Brundage concluded that Lang was moderately limited in her ability to understand, remember and carry out detailed instructions, her ability to maintain concentration for extended periods, her ability to sustain an ordinary routine without special supervision and her ability to make simple work-related decisions.  (Tr. 150).  She also found Lang moderately limited in her ability to complete a normal work day or work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 151).  Finally, she found that Lang had moderate limitations in her ability to respond appropriately to changes in the work setting and her ability to set realistic goals.  (Tr. 152).  Dr. Brundage remarked that Lang was capable of performing unskilled, simple and routine work.  (Tr. 152).

Dr. Brundage completed a second psychiatric review technique, covering the time period between August 11, 2003, and April 22, 2005.  (Tr. 154-167).  She determined that there was insufficient evidence to determine whether or not Lang suffered from any mental disorders during that time period.  (Tr. 154).

20

### C. February 6, 2006 Consultative Examination

Lang underwent a second consultative exam with Dr. Zerba on February 6, 2006. (Tr. 381-82). She reported her chronic medical issues, and that she had trouble sleeping and had nobody she could count on. (Tr. 381). She reported that she was fired from her job after going on medical leave and that she was looking for work. (*Id.*). Lang reported having one friend and no hobbies and that she generally remained in the house with her curtains up to prevent light from coming in. (*Id.*). She was driven to the appointment by her father. (*Id.*). Her grooming and hygiene were "excellent." (*Id.*). Upon examination, Lang's reality testing "seemed intact," her insight poor and her judgment "fair-good." (*Id.*). She presented no psychosis or suicidal or homicidal thoughts. (*Id.*). "She was depressed and tearful with blunted affect." (*Id.*). She was oriented to person, place and time, able to recall six numbers forward and four backward, two of three objects, four presidents, two cities (naming three states as well), several famous people and current events, and completed serial threes and two of three multiplication questions. (Tr. 381-82). She could not interpret either of two proverbs and could not correctly identify similarities and differences of objects. (Tr. 382). She could make correct judgment assessments with hypothetical scenarios. (*Id.*). Dr. Zerba diagnosed Lang with major depressive disorder, and assessed a GAF score of 51 and a guarded prognosis. (Tr. 382).

### D. February 21, 2006 Psychiatric Review Techniques and Mental RFC Assessment

On February 21, 2006, Dr. Leonard Balunas completed two psychiatric review techniques for Lang, one for the period of August 11, 2003 through March 14, 2005, in which he found insufficient evidence of a mental impairment, (Tr. 176-89), and a second, covering the period of March 15, 2005 and forward, in which he found that Lang suffered from both an affective disorder and an anxiety-related disorder. (Tr. 194-207). He found that she suffered from major

21

depressive disorder that was diagnosed at the consultative examination, but that was not fully supported by reported signs and symptoms.  (Tr. 197).  He also found that she suffered from an anxiety disorder related to her general medical condition.  (Tr. 199).  He determined that she had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining CPP, with no episodes of decompensation. (Tr. 204).  He concluded that she was able to do unskilled work.  (Tr. 208).

Dr. Balunas also completed a mental RFC for Lang, finding that she was moderately limited in her ability to understand, remember and carry out detailed instructions, her ability to maintain attention and concentration for extended periods, and her ability to accept instructions from and respond appropriately to criticism from supervisors.  (Tr. 190-91).  He concluded that she was capable of performing "unskilled work with these limitations."  (Tr. 192).

### E.    April 1, 2008 Consultative Examination

Lang underwent another consultative examination with Dr. Zerba on April 1, 2008.  (Tr. 648-49).  Lang reported that she continued to suffer from nausea and vomiting, pancreatic flare-ups that send her to the hospital, and uncontrolled high blood pressure.  (Tr. 648).  She reported no friends or hobbies, and that during her typical day she was "[c]loudy, crying, stressed out [and] depressed."  (*Id.*).  She and her daughter live together and both take care of the house with help from the daughter's grandmother.  (*Id.*).  Lang was driven to the appointment by a cousin, and her hygiene and grooming were "good."  (*Id.*).  Upon examination, Dr. Zerba found Lang's reality testing intact, her insight impaired and her judgment "fair-poor."  (*Id.*).  Lang reported voices that Dr. Zerba classified as "self-talk," but no suicidal or homicidal thoughts.  (*Id.*).  Lang was characterized as "depressed and anxious and angry with constricted affect."  (*Id.*).  She was found to be oriented to person, place and time, able to repeat five numbers forward and

22

backward, recall two of three objects, name several presidents, two famous people, several current events, but no large cities.  (Tr. 648-49).  She correctly completed serial threes and two of three multiplication equations.  (Tr. 649).  She could not interpret either of two proverbs nor contrast differing objects.  (*Id.*).  She was unable to make correct judgment assessments of various scenarios.  (*Id.*).  Dr. Zerba diagnosed Lang with major depressive disorder and issued her a GAF score of 52 and a fair prognosis.  (*Id.*).

F.    *April 15, 2008 Psychiatric Review Technique and Mental RFC Assessment*

Dr. Valorie Domino completed a psychiatric review technique and mental RFC assessment for Lang on April 15, 2008.  (Tr. 543-60).  She diagnosed Lang with an affective disorder, specifically major depression.  (Tr. 543; 546).  She determined that Lang had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining CPP.  (Tr. 553).  She had no episodes of decompensation.  (*Id.*).  In the mental RFC assessment, Dr. Domino found that Lang was moderately limited in her ability to understand, remember and carry out detailed instructions and maintain attention and concentration for extended periods.  (Tr. 557).  She concluded that, despite these limitations, Lang was "capable of a wide range of semi-skilled and unskilled tasks."  (Tr. 559).

**C.**    **Framework for Disability Determinations**

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

23

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.      The ALJ's Findings

After remand by the Appeals Council, the ALJ, following the five-step sequential analysis, found Lang not disabled.  (Tr. 453-66).  At Step One he determined that she had not engaged in substantial gainful activity since her alleged onset date.  (Tr. 459).  At Step Two he

found that she suffered from the following severe impairments:  "labile hypertension; GERD [gastroesophageal reflux disease]; history of ovarian cysts; history of pancreatitis; irritable bowel syndrome; anxiety and depression."  (*Id.*).  At Step Three he determined that none of Lang's impairments, either alone or in combination, met or medically equaled a listed impairment.  (*Id.*).  He did not specifically state what limitations she had with regard to her activities of daily living or her social functioning, but found that she had moderate difficulties in CPP.  (Tr. 460).  The ALJ then assessed Lang's RFC, finding her capable of performing "the full range of sedentary work."  (Tr. 461).  At Step Four he determined that, based on her RFC, Lang was unable to return to her past relevant work.  (Tr. 465).  At Step Five the ALJ concluded that based on her age, education, vocational background and RFC assessment, the Medical-Vocational Guidelines directed a finding of not disabled.  (Tr. 465-66).

### E.       Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

25

support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

Lang argues that the ALJ improperly gave greater weight to non-examining consulting physician Dr. Leigh's opinion over the opinion of treating cardiologist Dr. Mathew, and that in

doing so the ALJ violated the Commissioner's own regulations regarding the weight to be given to a treating physician's opinion. She further argues that the ALJ failed to consider non-exertional limitations caused by her psychological problems when determining her RFC assessment and what jobs she could still perform. The court takes each argument in turn.

### 1.    The Weight Given to Dr. Mathew's Opinions

Lang argues that the ALJ erred in the weight he gave to Dr. Mathew's opinions that she was disabled from work. She argues that the ALJ improperly focused on Dr. Mathew's concessions that she did not have certain complications at the present time (although noting that she did have precursors to those complications), and correlated those statements with the statements of consulting Dr. Leigh. Instead, she argues, the ALJ he should have focused on Dr. Mathew's statements that Lang's present symptoms of dizziness, nausea and vomiting are what render her unable to work on a sustained basis. She further argues that giving Dr. Leigh's opinion more weight was error in and of itself since he was a non-examining physician who was an internist rather than a specialist and who did not have the benefit of the full medical record at the time he rendered his opinion, specifically the deposition testimony of Dr. Mathew.

Under the regulations, an ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2). If an ALJ declines to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion

27

with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2). The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion. *Id.*, *citing Soc. Sec. Rul*. 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5. An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record. 20 C.F. R. § 404.1527(e)(1), (e)(3).

Here, the ALJ gave good reasons for not giving Dr. Mathew's opinion controlling weight. The ALJ noted that Lang's complaints of complications from her uncontrolled blood pressure, including nausea, dizziness and headaches, were more sporadic than consistent, and were at times accompanied by her failure to take her prescribed medications, resulting in a worsening of her symptoms. (Tr. 462). *See* 20 C.F.R. §§ 404.1530(b), 416.930(b) ("If you do not follow the prescribed treatment without good reason, we will not find you disabled.").[3] He further noted that despite Lang's uncontrolled blood pressure, she had not developed any related cardiovascular problems that would support a finding of disabled. (Tr. 462). He noted that some of Dr. Mathew's restrictions were not supported by his own findings, specifically his finding that she could lift no weight whatsoever, could only sit for less than six hours a day and could not

---

[3] Lang's failure to take her medications as prescribed also negatively impacts her credibility regarding the alleged extent of her ailments. (Tr. 462); *See* SSR 97–6p ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."). *See also Lemle v. Comm'r of Social Security*, 2012 WL 1060111, at *9 (E.D. Mich. Jan. 27, 2012) ("The Sixth Circuit recognizes that a claimant's failure to follow prescribed treatment is evidence supporting an ALJ's factual finding that the claimant's testimony was not fully credible. *See Sias v. Secretary of Health & Human Serv's.*, 861 F.2d 475, 480 (6th Cir.1988)").

reach.  (Tr. 462-63).  He noted that Dr. Mathew's opinions consistently found that Lang had no trouble caring for her own personal needs, which included dressing, laundry, meal preparation and housework, and that other of Dr. Mathew's opinions found no limitations on her ability to stand or walk, reach, push or pull.  (*Id.*).  While Dr. Mathew did opine in his deposition that Lang could do these things only at her own pace and not on a sustained and continued basis, the ALJ discounted this statement, as he did other of Dr. Mathew's statements, based on its conflict with the objective medical evidence which did not support such a requirement.  (Tr. 464).

The ALJ opined that Dr. Mathew's opinions could have been based on an incomplete understanding of the disability standard under the Act or based on his sympathetic position in relation to his patient, opinions which, in light of the foregoing, are more than mere speculation. (Tr. 464).  For all of these reasons, the ALJ properly could give more weight to Dr. Leigh's opinion than Dr. Mathew's.  (Tr. 465).  Moreover, the ALJ did not completely reject Dr. Matthew's opinions, and instead gave them some weight.  (*Id.*).  As a result, the ALJ specifically found that Lang was not capable of working in any high-stress environment, and he restricted her to low-stress clerical-type jobs.  (*Id.*).

The court finds that the ALJ gave good reasons for giving less than controlling weight to Dr. Mathew's opinions and that those reasons are supported by substantial evidence in the record.  The ALJ was correct in pointing out the discrepancies among Dr. Mathew's various opinions and between his opinions and his treatment records.  Furthermore, while the lack of cardiovascular complications is not the only reason the ALJ gave for rejecting Dr. Mathew's opinions, it is a valid one based on the evidence of record.  *See Shyne v. Sec'y of Health and Human Servs.*, 711 F.2d 1059 (6th Cir. 1983) (where ALJ based decision in part on lack of complications from hypertension, decision to deny benefits affirmed).  He also noted normal

29

stress test results and the fact that her primary care physician had recommended aerobic exercise. (Tr. 462, 626).  In addition, the evidence of record shows that Lang's latest ECG results in 2009 were normal and her own reports of her daily activities were not consistent with the limitations recommended that Dr. Mathews opined were necessary.  (Tr. 462; 464; 524-41; 706).

While evidence may exist in the record to support Lang's position, the relevant consideration at this appellate stage of the proceedings is whether substantial evidence exists which supports the conclusion reached by the ALJ.  *Crisp v. Sec'y of Health and Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986).  The two concepts are not mutually exclusive, and here, the court finds that the ALJ gave sufficient reasons for the weight given to Dr. Mathew's opinions and that substantial evidence supports his conclusion.

### 2.    ALJ's Consideration of Lang's Non-Exertional Limitations

Lang argues that the ALJ, in determining that she could perform a "wide range of semi-skilled and unskilled tasks," failed to account for her moderate limitation in CPP, despite the Appeals Council's specific instruction upon remand that the ALJ do so.  She argues that a limitation to "a wide range of semi-skilled and unskilled tasks" is no more enlightening than a finding that a claimant can do "simple, repetitive work," which the Appeals Council determined did not sufficiently account for a moderate limitation in CPP (at least as it related to her past relevant work).[4]  She claims error because the ALJ did not pose a hypothetical to the VE at the hearing incorporating this limitation.

In support of her argument, Lang cites several cases holding that an ALJ's vague description of "simple work" does not itself sufficiently account for a moderate limitation in

---

[4] It should be noted that the because the ALJ's initial decision terminated at Step Four with a finding that Lang could return to her past work, the Appeals Council did not address whether a limitation to "simple, repetitive work" would necessarily require VE testimony.  (Tr. 511-12).

CPP.  *See Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005); *Brown v. Comm'r of Soc. Sec.*, 672 F. Supp. 2d 794, 797 (E.D. Mich. 2009).  However, those cases are inapplicable where the "simple work" limitation originates not with the ALJ, but with a consulting physician in conjunction with his or her well-supported medical findings.

Here, Dr. Domino specifically found Lang still capable of a "wide range of unskilled and semi-skilled tasks" despite also finding a moderate limitation in CPP.  (Tr. 559).[5]  As noted, numerous courts have held that an ALJ's decision similar to the one in question here is adequately supported where a consulting physician qualifies a moderate CPP limitation with a description of the type of work he believes the claimant can nevertheless perform.  *See Infantado v. Astrue*, 264 Fed. Appx. 469, 477 (6th Cir. 2008) (finding substantial evidence supports ALJ's decision where psychiatrist found moderate CPP limitation but then concluded that claimant was capable of performing simple tasks on a sustained basis); *Young v. Comm'r of Soc. Sec.*, No. 10-11329, 2011 U.S. Dist. LEXIS 70624 (E.D. Mich. May 23, 2011) *adopted by* 2011 U.S. Dist. LEXIS 70620 (same conclusion where consulting examiner found moderate CPP limitation but found claimant capable of unskilled work); *Taylor v. Comm'r of Soc. Sec.*, No. 10-12519, 2011 U.S. Dist. LEXIS 77117  (E.D. Mich. May 17, 2011) *adopted by* 2011 U.S. Dist. LEXIS 74293 (same conclusion where consulting examiner found plaintiff capable of "unskilled work on a 'sustain[ed] basis.'"); *Seach v. Comm'r of Soc. Sec.*, No. 10-11741, 2011 U.S. Dist. LEXIS 50580  (E.D. Mich. Apr. 6, 2011) *adopted by* 2011 U.S. Dist. LEXIS 50569  (same conclusion

---

[5] Although previous consulting examiners had limited Lang to unskilled work based on an assessed moderate CPP limitation, the ALJ gave good reasons for rejecting those opinions based on the fact that they were consulting physicians and their opinions were not supported by other medical evidence of record.  (Tr. 459-60).  He found Dr. Domino's conclusion more consistent with the fact that there were few references to mental complications in Lang's treating file.  (Tr. 460).  And, while Lang argues that Dr. Mathew did opine that one of the reasons Lang could work was because she could not "think properly," she concedes that he is neither a psychologist nor a psychiatrist.  (Tr. 718; Plf. Brf. at 16).

where consulting examiner found claimant "retains the capacity for simple tasks on a sustained basis."); *Sutherlin v. Comm'r of Soc. Sec.*, No. 10-10540, 2011 U.S. Dist. LEXIS 11987  (E.D. Mich. Feb. 8, 2011) (same conclusion where consulting examiner found claimant capable of simple "one to two step tasks on a sustained basis."); *Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 U.S. Dist. LEXIS 103452  (E.D. Mich. Sept. 30, 2010) (consulting examiner found claimant capable of simple, unskilled work despite moderate CPP limitation); *Hess v. Comm'r of Soc. Sec.*, No. 07-13138, 2008 U.S. Dist. LEXIS 113562  (E.D. Mich. June 16, 2008) *adopted by* 2008 U.S. Dist. LEXIS 46734  (consulting examiner found claimant capable of "unskilled tasks on a sustained basis" despite a moderate CPP limitation).

Dr. Domino's finding that Lang was capable of performing more than simply unskilled work despite her moderate, rather than mild, CPP limitation, does not change the analysis.  That a person suffers from a moderate, rather than a mild CPP limitation, does not necessarily limit her to unskilled work.  *See Bragg v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 45095, *5-6 (E.D. Mich. March 30, 2012) (ALJ's conclusion that claimant could perform semi-skilled work was not inconsistent with moderate limitation in CPP).

Where the non-exertional limitation does not substantially erode the occupational base, an ALJ does note err in failing to pose such a limitation to a VE.  *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528-29 (6th Cir. 1981).  A "limitation" to semi-skilled and unskilled sedentary work is not considered a "non-exertional limitation," it simply indicates the categories of work that a claimant could perform based on her transferrable skills.[6]  Thus such a limitation does not "significantly erode" the job base such that VE testimony would be required, because it is itself the job base.  *See Medical–Vocational Guidelines*, 20 C.F.R. Appx. 2 to

---

[6] As the VE noted in his testimony, Lang's previous work was semi-skilled in nature, and thus his testimony was based on jobs where those skills would transfer.  (Tr. 796).

Subpart P of Part 404.  Therefore, the ALJ did not err in not including this "limitation" in his RFC or in not posing a hypothetical including this limitation to the VE, but instead relying on the Medical-Vocational Guidelines (although also referencing VE testimony in his decision) to determine that there were a significant number of jobs in the national economy that Lang could perform.

The fact that he did not include any other non-exertional limitations in his RFC assessment or in a hypothetical to the VE is similarly unavailing.  Lang does not specify what other specific limitations the ALJ should have included based on her general moderate CPP limitation.  Nor does she point to any record evidence noting specific limitations based on this general assessment, and the court finds none in its review.  The ALJ properly found that the "voluminous treating records continue to reveal no complaints of related symptoms and medical needs questionnaires continue to make no reference to related diagnoses or limitations" which would compel a different conclusion.  (Tr. 460, citing record exhibits 24F, 28F, 31F, 34, 36F, generally and 40F, p. 18.  Therefore, the court finds that substantial evidence of record supports the ALJ's RFC assessment as the culmination of all of Lang's physical and non-exertional limitations he found credible, and as such, his decision withstands scrutiny.

## III.    CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Lang's Motion for Summary Judgment [20] be **DENIED**, the Commissioner's Motion [25] be **GRANTED** and this case be **AFFIRMED**.

Dated: August 10, 2012                           s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 10, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

34